# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RODERICK G. PORTER,
    *Plaintiff*,

    v.                          No. 3:19-cv-01080 (JAM)

CITY OF BRIDGEPORT,
    *Defendant*.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Roderick G. Porter has served for nearly thirty years with the police department of the City of Bridgeport, Connecticut. He has filed this action against the City, alleging claims of racial discrimination and retaliation for complaining about discrimination.

The City has now moved for summary judgment. Because the City has shown on the basis of an extensive record that no genuine fact issues remain to support any of Porter's claims, I will grant the City's motion.

### BACKGROUND

Porter has served with the Bridgeport police department since 1993.[1] Over the years, he has risen through the officer ranks and has served as a captain since 2007.[2]

In early 2016, the City's police chief resigned, leaving that position vacant.[3] Porter hoped to be selected as acting chief while the city conducted a search for a permanent chief. But the City's mayor—Joseph Ganim—chose a different candidate—Armando Perez—for the job.[4]

---

[1] Doc. #70 at 1 (¶ 2).
[2] *Id.* at 2 (¶ 8).
[3] *Id.* at 14 (¶ 33).
[4] *Ibid.* (¶ 34).

Perez had served with the department since 1983, and—like Porter—he had previously served as an officer, sergeant, lieutenant, and captain.[5] Porter is African American; Perez is not.[6]

In June 2018, while Perez was still serving as acting chief, Porter received a call from Kenneth Kubel, a police officer in a neighboring town.[7] Kubel told Porter that one of Porter's co-workers—Mark Straubel, who was then serving as a Bridgeport police captain—was having an "inappropriate relationship" with Kubel's wife who worked as an administrative assistant to Perez.[8]

Most importantly for present purposes, Kubel also told Porter that Straubel had sent Kubel's wife a series of racist text messages.[9] Porter sent an email about his conversation with Kubel to Perez on June 29, 2018.[10] Porter's email referred to the "inappropriate relationship" and "alleged inappropriate racial comments" by Straubel, but added that Kubel "did not provide any specifics regarding either of these issues."[11]

At the time, neither Kubel nor Porter had "seen [the text messages] fully," but later, in the course of this litigation, Porter learned the specific content of these messages.[12] There were three clusters of messages between Straubel and Kubel's wife, at least two of which reference Porter in a racially repugnant manner.[13] In the first cluster, Straubel wrote, in part: "I asked porter if he had seen planet of the apes[.] He said .. Yes[.] I asked him if it made him homesick[.]"[14] In the second cluster he wrote: "Just shitty. Probably a dirty filthy nigger . . . No. I hate them. We need

---

[5] *Id.* at 10 (¶¶ 26–27).
[6] *See* Doc. #78 at 1 (¶ 1); Doc. #36 at 21 (¶ 182).
[7] Doc. #70 at 48 (¶ 104)
[8] Doc. #71 at 2.
[9] *Ibid.*; *see also* Doc. #59-36 at 2.
[10] Doc. #70 at 48 (¶ 106); Doc. #59-36 at 2.
[11] Doc. #59-36 at 2.
[12] *See* Doc. #70 at 48, 55 (¶¶ 104, 124).
[13] *See* Doc. #70-19 at 2–5 (reproducing the text messages). It is not clear from the record when Kubel, Porter, or Perez learned that some of Straubel's text messages referred specifically to Porter. *See, e.g.*, Doc. #70 at 48 (¶ 107).
[14] Doc. #70-19 at 2.

a race war . . . Yes. They are a cancer. When you remove a cancer you take some healthy

tissue . . . . No. It's a war for survival. They seek our extinction . . . Nope. It's true[.]"[15] In the

third cluster he wrote: "No. Becky[.] He [Porter] makes me sick[.] Place makes me

sick . . . . He's [Porter's] not even marching in nigger parade but I have to[.]"[16]

On June 30, 2018, Perez responded to Porter's email about Kubel's telephone call.[17]

Perez said that he had spoken with the neighboring town's police chief and that Kubel had

refused to cooperate with an investigation into "wrongdoing or inappropriate racial comments

made by anyone."[18]

About one month later, Kubel filed a citizen complaint with the internal affairs office of

the City's police department on July 26, 2018.[19] That same day, Perez went to Straubel's house

and informed him that he had been placed on administrative leave.[20] While he was at Straubel's

house, Perez told Straubel "everything was all right," and "we would get through this."[21]

Several days after Kubel's complaint, Perez opened an internal affairs investigation into

Straubel's messages on August 2, 2018.[22] Straubel was scheduled to be interviewed in

connection with the investigation, but he retired from his job before the interview and before the

internal affairs investigation concluded.[23] Consistent with a department policy stating that

internal affairs investigations are to "immediately cease" in the event that the target of the

---

[15] *Id.* at 3–4.
[16] *Id.* at 5.
[17] Doc. #70 at 48 (¶ 108); Doc. #59-36 at 3.
[18] *Ibid.*
[19] *Id.* at 49 (¶¶ 112–13).
[20] *Id.* at 50 (¶ 114).
[21] Doc. #70-3 at 9.
[22] Doc. #70 at 51 (¶ 116).
[23] *Id.* at 52 (¶¶ 120–21).

investigation separates from the department, the City then closed the investigation into Straubel, and no further action was taken in the matter.[24]

On September 19, 2018, after the investigation was closed, Porter filed complaints of race-based employment discrimination against the City with both the Connecticut Commission on Human Rights and Opportunities (CHRO) and the U.S. Equal Employment Opportunity Commission (EEOC).[25] The City was served with the complaints on or about October 11, 2018.[26]

Meanwhile, both Porter and Perez (among other candidates) had applied for the permanent police chief position.[27] The official search commenced in Spring 2018, and applications were due by June 15, 2018.[28]

On or about November 5, 2018, Mayor Ganim selected Perez for the permanent chief position.[29] Mayor Ganim has testified that his decision to appoint Perez reflected his "best judgment," which was informed by "a variety of factors," including Perez's "experience in the position as acting chief of police for the city of Bridgeport," "community input," "input from department heads," "forms," and "interviews with community groups and panels."[30]

Nearly two years later, Perez resigned as police chief in September 2020.[31] His resignation followed his federal arrest on criminal charges alleging that he and another person had fraudulently manipulated the hiring process for the chief position.[32] On or about the same

---

[24] *Ibid.* (¶¶ 122–23).
[25] Doc. #78 at 14–15 (¶ 48).
[26] *Id.* at 15 (¶ 49).
[27] Doc. #70 at 26 (¶ 56).
[28] *Id.* at 19, 25 (¶¶ 43, 55).
[29] *See* Doc. #70 at 37 (¶ 84).
[30] Doc. #70-1 at 32–34.
[31] Doc. #70 at 44 (¶ 96).
[32] *Id.* at 42 (¶ 93).

day as Perez's arrest, Mayor Ganim appointed Rebecca Garcia as acting police chief.[33] Garcia had been serving since November 2019 as an assistant police chief.[34] Unlike Porter, Garcia is not African American.[35]

Porter filed this federal lawsuit on July 1, 2019.[36] He alleges seven counts involving three theories of liability. First, he alleges that the City failed to promote him because of his race, in violation of 42 U.S.C. §§ 1981 and 1983 (Count 1). Second, he alleges on the basis of Straubel's text messages that the City engaged in a racially hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 (Count 2), § 1981 (Count 3), and the Connecticut Fair Employment Practices Act (CFEPA) (Count 4). Third, he alleges that the City failed to promote him in retaliation for his CHRO and EEOC complaints, in violation of Title VII (Count 5), § 1981 (Count 6), and CFEPA (Count 7).[37] The City now moves for summary judgment on all seven counts.[38]

## DISCUSSION

The principles governing my review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve

---

[33] *Id.* at 44 (¶ 97).
[34] Doc. #70 at 41 (¶ 92).
[35] Doc. #36 at 21 (¶ 182).
[36] *See* Doc. #1.
[37] *See* Doc. #36 at 16–39.
[38] *See* Doc. #59.

close contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).[39]

As noted above, Porter alleges three theories of liability against the City. I will discuss each one in turn.

### *Discrimination (Count 1)*

Porter claims that the City engaged in racial discrimination when it failed to promote him on three occasions: first, when Mayor Ganim chose Perez over Porter as acting chief in early 2016; second, when Mayor Ganim chose Perez over Porter for the permanent chief position in November 2018; and third, when Mayor Ganim chose Garcia over Porter as acting chief in September 2020.[40]

Porter alleges a violation of 42 U.S.C. § 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). This section "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 224 (2d Cir. 2004). A violation of § 1981 is actionable under 42 U.S.C. § 1983. *See Duplan v. City of New York*, 888 F.3d 612, 619–21 (2d Cir. 2018).[41]

Porter's discrimination claim is subject to the familiar *McDonnell Douglas* three-step burden-shifting framework.  *See Flowers v. Conn. Light & Power Co.*, 774 F. App'x 33, 35 (2d

---

[39] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

[40] *See* Doc. #36 at 38–39 (¶¶ 767–769).

[41] The parties do not appear to dispute that the adverse decisions at issue were made by the City's mayor and that the mayor was therefore the chief policymaker whose actions may be attributed to the City for purposes of § 1983 liability. *See Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020) (citing *Monell v. Dept. of Soc. Servs. Of City of New York*, 436 U.S. 658 (1978)).

Cir. 2019) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). At the first step, Porter must show that he belongs to a protected class and was qualified for the position for which the City failed to hire him. *Ibid.* At the second step, the City must come forward with evidence of a nondiscriminatory reason for its decision. *Ibid.* At the third step, Porter must show a genuine fact issue to suggest that the City's proffered reason is a pretext for discrimination. *Ibid.*

Importantly, "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original). This means that even if an employee shows that he was treated unfairly, he has not necessarily carried his burden to show that discriminatory animus was the reason for the employer's adverse action. *See Borzon v. Green*, 778 F. App'x 16, 18 (2d Cir. 2019). Thus, for example, evidence that a police officer was subject to adverse action "because he broke the police code of silence by speaking to the press" is not enough to show that the reason for an adverse action against the officer was "because of his race or national origin." *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 129 (2d Cir. 2013).

Applying the *McDonnell Douglas* framework, I conclude at the first step that Porter has carried his *prima facie* burden. The City does not dispute that Porter was qualified for each of the acting and permanent chief positions at issue and that it promoted persons (Perez and Garcia) who are not members of Porter's protected class.

Next, as to the second step, I conclude that the City has come forward with legitimate, non-discriminatory reasons for its promotion decisions. As to the decisions to promote Perez over Porter to both the acting and permanent chief positions, Mayor Ganim testified that both decisions reflected his "best judgment."[42] His latter decision was based on "a variety of factors,"

---

[42] Doc. #70-1 at 22, 32.

including Perez's "experience in the position as acting chief of police for the city of Bridgeport," "community input," and "input from department heads."[43] These are legitimate, non-discriminatory reasons for not selecting Porter. *See, e.g., Lomotey v. Conn.-Dep't of Transp.*, 355 F. App'x 478, 482 (2d Cir. 2009) (legitimate, non-discriminatory reasons included explanation that "another candidate was better qualified" and plaintiff "did not perform as well in the interview").

As to the third step, Porter has not established a genuine fact issue to suggest that these proffered reasons were a pretext for racial discrimination. He argues that "Ganim participated in the rigging of the Police Chief selection process resulting in the appointment of Perez as Police Chief on a permanent basis."[44] To support this claim, he cites a statement by federal prosecutors in a filing in the criminal case against Perez that Perez allegedly "told another officer that Ganim had promised him the job regardless of who applied."[45]  But a plaintiff may not survive summary judgment by relying on inadmissible hearsay. *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013). The statement here is obvious hearsay: a statement by a prosecutor about what another officer stated that Perez said, all offered for the truth of the matter asserted.

In any event, even assuming the mayor had pre-selected Perez over Porter or other candidates, this still falls short of showing that the mayor did so for any racially discriminatory reason. As the Second Circuit has noted, "neither § 1981 nor Title VII forbids favoritism, nepotism, or cronyism, so long as it is not premised on animus against a protected class." *Vill. of Freeport v. Barrella*, 814 F.3d 594, 613 (2d Cir. 2016). Porter does not point to any evidence suggesting that the mayor declined to promote Porter for any reason related to Porter's race.

---

[43] *Id.* at 33–34.
[44] Doc. #70 at 64 (¶ 52).
[45] Doc. #70-8 at 5.

As to the promotion of Garcia rather than Porter to the acting chief position following Perez's arrest and resignation in September 2020, the mayor testified that he chose Garcia because she "was the best qualified individual under [his] judgment when the position had been vacated and needed immediate appointment."[46] Her qualifications included "her performance . . . as a Bridgeport police officer . . . and in her role as assistant chief."[47] The mayor also testified that he was impressed her decision-making skills during a "crisis situation."[48] These are all legitimate, non-discriminatory reasons.

In response, Porter argues that his professional credentials were far superior to either those of Perez or Garcia. Unlike Perez, Porter holds a bachelor's degree and a master's degree.[49] Unlike Perez or Garcia, Porter is a graduate of the FBI National Academy.[50] Porter also arguably had more command experience than Perez or Garcia at the time that the selections were made.[51]

But while "qualifications evidence may suffice, at least in some circumstances, to show pretext," *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006), the Second Circuit has stressed the difficulty a plaintiff faces when relying on superior qualifications alone to support a claim for unlawful discrimination. "In effect," to defeat a motion for summary judgment based on qualifications evidence alone, "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Moy v. Perez*, 712 F. App'x 38, 42 (2d Cir. 2017).

---

[46] Doc. #70-1 at 41.
[47] *Ibid.*
[48] *Id.* at 51.
[49] Doc. #70 at 60 (¶ 31).
[50] *Id.* at 66 n.5.
[51] *See id.* at 65-66.

Only if this demanding standard is met may there arise an inference of discriminatory animus. Otherwise, as the Second Circuit has made clear, "we must respect an employer's unfettered discretion to choose among qualified candidates." *Flowers*, 774 App'x at 35; *Peddy v. L'Oreal USA, Inc.*, 848 F. App'x 25, 27 (2d Cir. 2021) (same).

While the record shows without a doubt that Porter was a highly qualified candidate, the record also suggests that Perez and Garcia had some strengths over Porter. Perez had served with the police department longer about ten years longer than Porter and, unlike Porter, he was bilingual.[52] And for her part, Garcia had already gained relevant experience by serving as assistant chief.[53] The record falls well short of showing that Porter's qualifications were so objectively superior to those of Perez and Garcia that no reasonable person, in the exercise of impartial judgment, could have chosen Perez or Garcia over Porter for the police chief positions.[54]

In short, Porter has not carried his burden to show a genuine fact issue that the City failed to promote him to the police chief positions because of his race. Accordingly, I will grant the City's motion for summary judgment as to Porter's claim that the City discriminated on the basis of race when it declined to promote him to the police chief positions.

### Hostile work environment (Counts 2, 3, and 4)

Porter alleges a race-based hostile work environment in violation of Title VII, § 1981, and CFEPA. The same legal standard governs all three claims. *See Viznzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010); *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010).

---

[52] Doc. #70 at 10 (¶ 28); *see also id.* at 60 (¶ 32).
[53] *Id.* at 41 (¶ 92).
[54] The parties have filed post-argument submissions about whether Garcia's command experience met the City Charter's requirements. *See* Docs. #85-88. Even if I agreed with Porter's arguments that Garcia did not technically qualify, this would amount to no more than a foot fault that does little to suggest that the City acted for discriminatory reasons in choosing Garcia over Porter for the acting chief position.

A hostile work environment claim requires a plaintiff to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). A court must consider "the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387 (2d Cir. 2020). A hostile work environment claim has both "objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Ibid.*

Porter's hostile work environment claims rely solely on Straubel's text messages. These messages from Straubel to a co-worker of Porter's were undoubtedly vile and racist. But they did not create a hostile working environment. They were not sent to Porter (even though they referred to him), and they were not broadly distributed to others in the working environment. There is no evidence that the text messages materially affected Porter's day-to-day working environment at the police department (subjectively or objectively) or that anyone else shared or joined in Straubel's views. Porter points to no evidence of other racially hostile comments or incidents during his almost three decades of employment with the police department.

The facts here fall below the type of severe or pervasive conditions that are required to support a hostile work environment claim. *See, e.g.*, *Alfano v. Costello*, 294 F.3d 365, 379 (2d Cir. 2002) (collecting cases establishing threshold of frequency and severity and concluding that five incidents of sexual harassment over four years was insufficient to create a hostile work

environment); *Arroyo v. WestLB Admin., Inc.*, 213 F.3d 625, at *2 (2d Cir. 2000) ("Arroyo's allegations—of essentially three incidents of racial animosity by a co-worker spanning over 25 months, with each incident separated by a full year, during which time no racial slurs were made—were insufficient to raise a triable issue of hostile work environment harassment"); *Sanchez v. Univ. of Conn. Health Care*, 292 F. Supp. 2d 385, 396 (D. Conn. 2003) (three racist comments by three separate coworkers, which were "sporadic comments, some not directed to the plaintiff directly," were not sufficiently severe or pervasive to support claim of hostile work environment).

Even assuming that Straubel's text messages were sufficiently severe and pervasive to create a hostile work environment, Porter has not shown that the environment should be imputed to the City. A plaintiff must show "that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009). Where, as here, the harassment is attributable to a co-worker rather than to a supervisor, a plaintiff must show that the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Ibid*.

Porter does not argue that the City failed to provide a reasonable avenue for complaint; instead, he argues that Perez was slow to initiate an investigation and because the investigation was terminated upon Straubel's retirement.[55] But the record establishes that Straubel was placed on administrative leave on the same day that Kubel filed his citizen complaint with the department, and an internal affairs investigation was commenced just one week later. After Straubel left his employment and thus posed no ongoing risk of workplace harassment, it was not unreasonable or irresponsible for the City to discontinue its investigation.

---

[55] *See* Doc. #71 at 18.

No reasonable jury could conclude that Straubel's text messages created a hostile work environment for Porter, much less that any such environment should be imputed to the City. Accordingly, I will grant the City's motion for summary judgment on the hostile work environment claims (Counts 2, 3, and 4).

### Retaliation

Porter alleges that the City retaliated against him because he filed complaints with the CHRO and EEOC in September 2018. Porter claims three retaliatory acts: first, the appointment of Perez rather than himself as permanent police chief in November 2018; second, the selection of Garcia rather than himself to the assistant chief position in November 2019; and third, the appointment of Garcia rather than himself to the acting chief position in September 2020.[56] These retaliation claims are alleged under Title VII (Count 5), § 1981 (Count Six), and CFEPA (Count Seven).

Here again I must apply the three-step *McDonnell Douglas* burden-shifting framework to analyze Porter's retaliation claims. *See Brockman v. NAES Corp.*, 2021 WL 863471, at *6 (D. Conn. 2021). At the first step, I will assume that Porter has carried his *prima facie* burden to show that he engaged in protected activity of filing complaints with the CHRO and EEOC and that he was later subject to adverse actions.

At the second step, the City has come forward with non-retaliatory reasons for each of the challenged decisions to promote Perez and Garcia over Porter. I have discussed these asserted reasons above.[57]

---

[56] *See* Doc. #71 at 39–40.

[57] As to the appointment of Garcia to the position of assistant chief in November 2019, Porter does not meaningfully contest that the City has advanced non-discriminatory reasons for this appointment. Doc. #59-5 at 20 (mayor's testimony that Garcia was appointed to assistant chief position "through normal processes for appointment to that position as articulated by the body of rules").

At the third step, Porter has failed to establish a genuine fact issue to show that the City's proffered reasons are a pretext for retaliation. "In order to succeed on a retaliation claim after a defendant has established a legitimate, non-discriminatory reason for the adverse action, the plaintiff must present evidence that retaliation was the 'but-for' cause of the action." *Varno v. Canfield*, 664 F. App'x. 63, 66 (2d Cir. 2016).

With respect to the appointment of Perez to the permanent chief position in November 2018, there is no evidence that this was because Porter had filed complaints with the CHRO and EEOC. This claim as to the appointment of Perez to the permanent chief position fails for the same reasons I have discussed above with respect to Porter's discrimination claim.

With respect to Garcia's promotions, Porter has no evidence at all that the City promoted Garcia over Porter in order to penalize Porter for filing his complaints. Nor can Porter conceivably rely on temporal proximity, because Garcia's promotions occurred in November 2019 and September 2020—more than a year after Porter filed his complaints with the CHRO and EEOC. Indeed, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013).

In short, no genuine issue of fact remains to support Porter's claims that the City retaliated against him by selecting Perez and Garcia over him for various promotions. Accordingly, I will grant the City's motion for summary judgment on Porter's retaliation claims (Counts 5, 6, and 7).

## CONCLUSION

For the reasons stated above, the Court GRANTS the defendant's motion for summary judgment (Doc. #59). The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 28th day of July 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge